**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**


----------------------------------------------------------------------X

**LEDGE LOUNGER, INC.**                                    :

                                                            :

               **Plaintiff,**                           :

                                                            :   **Case No. 4:23-cv-0727**

     **- against -**                                    :

                                                            :

**LUXURY LOUNGER, INC.**                              :

                                                            :

              **Defendant.**                           :

----------------------------------------------------------------------X


<u>**DEFENDANT'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**</u>

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION                                                          1

II.     DEFENDANT PRESERVED ITS RIGHT TO SEEK A            1
        CLAIM CONSTRUCTION THAT DISTINGUISHES
        BETWEEN THE FUNCTIONAL AND ORNAMENTAL
        (IF ANY) FEATURES OF THE PATENTED DESIGNS

III.    IT IS APPROPRIATE FOR COURTS TO DISTINGUISH        6
        BETWEEN THE FUNCTIONAL AND ORNAMENTAL
        (IF ANY) FEATURES AS PART OF THE CLAIM
        CONSTRUCTION PROCESS OF A DESIGN PATENT

IV.     THE APPROPRIATE DEFINITIONS OF "ORNAMENTAL"        8
        AND "FUNCTIONAL"

V.      DEFENDANT IS ENTITLED TO A CLAIM                   11
        CONSTRUCTION THAT IDENTIFIES THE FUNCTIONAL
        ASPECTS OF THE ASSERTED DESIGNS AND WHICH
        CONCLUDES THAT THE DESIGNS ARE ENTIRELY
        FUNCTIONAL

        A.    The Inventor of the Asserted Designs Publicly
              Stated He Designed the Chaise Lounge for Functionality      12

        B.    Plaintiff Owns Utility Patents that Dislcose the Functionality
              Asserted Design                                            16

VI.     CONCLUSION                                         19

# TABLE OF AUTHORITIES

**Cases**

*Application of Carletti*, 328 F.2d 1020, 1022 (C.C.P.A. 1964)                    15

*Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 501 F.3d 1314, 1319
(Fed. Cir. 2007), *abrogated on other grounds,*
by *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008)        10

*Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008)           10

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1333 (Fed. Cir. 2015)   7

*Funai Elec. Co. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1366 (Fed. Cir. 2010)   19

*Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1180, ft. 10 (Fed. Cir. 1995)       9

*PHG Techs., LLC v. St. John Companies, Inc.*, 469 F.3d 1361, 1366 (Fed. Cir. 2006)   10, 11,

                                                                                 12, 16

*OddzOn Prod., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1404–05 (Fed. Cir. 1997)   7

*Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1293–94 (Fed. Cir. 2010)     10

*Sport Dimension, Inc. v. Coleman Co.,* 820 F.3d 1316, 1320 (Fed. Cir. 2016)     7, 8

*Voice Techs. Grp., Inc. v. VMC Sys., Inc.*, 164 F.3d 605, 615 (Fed. Cir. 1999)   14

**Statutes**

35 U.S.C. § 101                                                                  2

35 U.S.C. § 112(f)                                                               3, 4

35 U.S.C. § 171                                                                  2, 8,
                                                                                 11, 15

Local Patent Rules, Rule 4.1(a)                                                  4, 5

**Other Authorities**

Manual of Patent Examination Procedure § 1504.01(c)                             8, 9
                                                                                 10, 14,
                                                                                 19

## I.      <u>INTRODUCTION</u>

Pursuant to the Patent Scheduling and Docket Control Order (as amended) and Local Patent Rule ("P.R.") 4.5, Defendant Luxury Lounger, Inc. ("Defendant"), hereby submits its responsive claim construction brief. ECF ## 32, 36.  In this suit, Plaintiff Ledge Lounger, Inc. ("Plaintiff") alleges infringement of two design patents, U.S. Patent Nos. D917,189 and D917,190 ("D189" and "D190" or the "Patents"). See Plaintiff's Opening Claim Construction Brief (ECF # 39), Exhibits 1 and 2 (ECF ## 39-1 and 39-2).  As shown on the face of each of the patents-in-suit, the Patents purport to protect and claim, "The ornamental design for a chaise, as shown and described."

The facts that the Patents at issue are design patents, and design patents protect only "ornamental" designs (as opposed to functional designs or the functional portions of designs that contain both ornamental and functional features) are critical to the substantive and procedural issues raised by the parties' briefing.

## II.     **DEFENDANT PRESERVED ITS RIGHT TO SEEK A CLAIM CONSTRUCTION THAT DISTINGUISHES BETWEEN THE FUNCTIONAL AND ORNAMENTAL (IF ANY) FEATURES OF THE <u>PATENTED DESIGNS</u>**

In an effort to avoid substantive examination into the functionality of Plaintiff's asserted designs, Plaintiff egregiously raises form over function and argues that Defendant somehow "waived" its right to raise functionality as part of the claim construction process.  Plaintiff's argument, however, cannot withstand scrutiny.  It should be rejected as an improper attempt to strip the Court of its authority to interpret the claims of the Patents as required by controlling law and to deny Defendant its opportunity to raise all relevant issues.

First, and most obviously, how would Plaintiff know to address this issue in its "opening" brief if Defendant had not already put Plaintiff on notice that Defendant intended to raise the

functionality issue as part of the claim construction process? The very fact that Plaintiff preemptively addressed the issue, before Defendant filed its claim construction brief, establishes that Defendant previously raised the issue and that Plaintiff had notice.  Indeed, in the very first sentence on this issue (Plaintiff's Opening Brief at page 11), Plaintiff accurately summarized the issue Defendant previously raised and will address in more detail below, namely, as part of the design patent claim construction process, the "Court must distinguish between functional and nonfunctional aspects of the claimed designs." *Id.*

Defendant raised the functionality of the asserted designs in its Answer, Defenses, and Counterclaims. See ECF # 26. By way of example, at paragraphs 70 (relating to the '189 Patent) and 77 (relating to the '190 Patent), Defendant alleged: "The '189 [and '190] patent is invalid because its design is not "ornamental" as required by 35 U.S.C. § 171; rather, the design is functional."

Defendant next raised the issue in its Preliminary Invalidity Contentions (served on Plaintiff on October 13, 2023), wherein it stated, *inter alia:* "The designs of the Patents are not proper statutory subject matter for design patents pursuant to 35 U.S.C. §§ 171 and/or 101 because the designs of the article(s) of manufacture depicted in the Patents are dictated primarily by the function of the article(s) and/or lack ornamentality."  The remainder for the Preliminary Invalidity Contentions went on to detail the bases for the functionality-based invalidity. See Exhibit 1 hereto.

Recognizing that the claim construction procedures set out in the local Patent Rules were designed primarily for utility patents, in correspondence between counsel for the parties, prior to the first steps of the claim construction process, counsel for Defendant wrote to counsel for Plaintiff as follows:

> Did you have any preliminary thoughts on the proposed claim terms and
> ultimately, claim construction.  Because the two asserted patents are both design
> patents, the claim construction process will not follow typical cases.  At the very
> least, based on the controlling case law and the two patents, I think we need a
> written description of what is disclaimed in the '190 Patent."

Email from Defendant's counsel to Plaintiff's counsel, dated October 16, 2023.  In response to

Defendant's inquiry, Plaintiff responded only that "The deadline to exchange claim terms for

construction is not until October 27, and we will do so at that time," with a request for citation to

the referenced "case law."  By way of further response, Defendant provided cites to and quotes

from two of the leading cases on the issue.

Plaintiff did not further respond to Defendant's efforts to engage in discussions aimed at

adapting the Local Rules to specifically address issues unique to design patents.  Rather, Plaintiff

merely wrote (on October 27, 2023): Per the Court's Patent Scheduling and Docket Control

Order (ECF No. 32) and Local Patent Rule 4-1, Ledge Lounger's response regarding the

exchange of proposed claim terms is as follows: There are no claim terms, phrases, or clauses in

the asserted patents that should be construed by the presiding judge, nor are there any claim

elements that should be governed by 35 U.S.C. § 112(f)."

And on November 14, 2023, Defendant served its Preliminary Claim Constructions, in

which it explicitly stated: "Though not related to any specific term in the claim of either asserted

patent, based on controlling case law, by way of argument in the claim construction briefing,

Defendant will seek a claim construction that identifies and limits the claims to only the

ornamental features (if any) of the claimed designs."  Thus, Defendant clearly and unequivocally

placed Plaintiff on notice that it intended to raise the issue of functionality as part of the claim

construction briefing process.

Notwithstanding (1) Defendant's identification of the issue of functionality of the asserted designs in numerous of its filing (including as part of the claim construction process itself) and (2) Defendant's attempts – which Plaintiff essentially ignored – to engage Plaintiff in a discussion of the issues in the context of claim construction, Plaintiff now argues that Defendant waived the issue because Defendant "did not identify any feature in the claimed designs that is partly, let alone, purely functional." Plaintiff's Opening Brief at 11. For its argument, Plaintiff relies on Local Rule 4.1(a), which provides: "By the deadline set in the Scheduling Order, each party must simultaneously exchange a list of claim terms, phrases, or clauses that the party contends should be construed by the presiding judge and must identify any claim element that the party contends should be governed by 35 U.S.C. § 112(f).

As an initial matter, Defendant's effort to have the Court differentiate between the functional and ornamental features of the Patents does not implicate "a claim term, phrase or clause." Thus, the Local Rule did not require Defendant to identify anything more than it did. In the absence of a violation of the Local Rule, there is no basis to conclude that Defendant waived its functionality argument as part of the claim construction process.

Though Plaintiff carefully chose the words of its arguments so as to not misstate the law, in so doing, Plaintiff's argument necessarily fails because it does not actually assert a violation of the Local Patent Rules. Local Rule 4.1(a) requires the simultaneous exchange of a list of claim terms, phrases, or clauses that the party contends should be construed by the presiding judge. Importantly, Plaintiff did not argue that Defendant failed to do so. Rather, Plaintiff argued that "Defendant did not identify any feature in the claimed designs that is partly, let alone, purely functional." The switch from "terms, phrases or clauses" to "features in the claimed designs" is subtle, yet important. The Rule does not require identification of "features in the claimed

4

designs" or any portion of the drawings.  Plaintiff did not allege that Defendant failed to provide a list of "terms, phrases or clauses."  Rather, Defendant asserted that Defendant did not "identify any features in the claimed design."  The alleged requirement to identify "features," however, does not appear in the Local Rules.

This issue arises because the Local Rules are written with utility, not design patents, in mind.  The claim of a design patent does not have any terms, phrases or clauses" and thus, none can be identified.  For this very reason, Defendant included the above-quoted "by way of argument in the claim construction briefing, Defendant will seek a claim construction that identifies and limits the claims to only the ornamental features (if any) of the claimed designs" language in its P.R. 4.1(a) statement. Other than providing the actual claim construction briefing long before it was required by the Patent Scheduling and Docket Control Order, there was nothing else Defendant should have or could have done to preserve the issue.

In an attempt to support its waiver argument, Plaintiff ignores the differences between design and utility patents, and implicitly argues that the two types of patents must be treated identically.  But elsewhere in its Opening Claim Construction Brief, in addressing issues other than functionality, Plaintiff went to great lengths to explain the differences between design and utility patents and how each must be construed under the law.

For example, in arguing for its proposed claim constructions (or lack thereof), at page 5 of its Opening Brief, Plaintiff explained: "To that end, in a design patent case, claim construction 'must be adapted to a pictorial setting.'" Indeed, in arguing for a claim construction that would merely present the jury with the drawings of the Patents, Plaintiff repeatedly stressed the differences in construing design patents vis-à-vis utility patents: "To that end, in a design patent case, claim construction 'must be adapted to a pictorial setting;'" "Design patents 'typically are

claimed as shown in drawings,' and therefore claim construction 'is adapted accordingly.;'" and "as a general matter, … courts should not treat the process of claim construction as requiring a detailed verbal description of the claimed design, as would typically be true in the case of utility patents."

Defendant agrees with Plaintiff, that design patents must be construed in a different manner than utility patents.  The inherent differences dictate a difference.  Plaintiff should not be permitted to argue for and rely on the differences in one context (its proposed constructions) and ignore the differences in arguing that Defendant waived it right to have the Court address functionality as part of the claim construction process.

For this, and the other reasons discussed above, Defendant did not waive its functionality arguments.

### III.   IT IS APPROPRIATE FOR COURTS TO DISTINGUISH BETWEEN THE FUNCTIONAL AND ORNAMENTAL (IF ANY) FEATURES AS PART OF THE CLAIM CONSTRUCTION PROCESS OF A DESIGN PATENT

Leaving aside the waiver issue, and notwithstanding that Plaintiff chose not to address the issue directly, the law is clear that the Court not only has the right to differentiate between the functional and ornamental (if any) features of the patented designs as part of the claim construction process, but the Court should so differentiate when the issue is raised.  As the Federal Circuit has explained:

> Whether a design patent is infringed is determined by first construing the claim to the design, when appropriate, and then comparing it to the design of the accused device. 3*Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577, 36 USPQ2d 1417, 1420 (Fed.Cir.1995). A design patent only protects the novel, ornamental features of the patented design. *See KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1450, 27 USPQ2d 1297, 1302 (Fed.Cir.1993); *Lee v. Dayton–Hudson Corp.*, 838 F.2d 1186, 1188, 5 USPQ2d 1625, 1627 (Fed.Cir.1988) ("[I]t is the non-functional, design aspects that are pertinent to determinations of infringement.") (footnote omitted). **Where a design contains both functional and non-functional elements, the scope of the claim must be construed in**

> **order to identify the non-functional aspects of the design** as shown in the
> patent.

*OddzOn Prod., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1404–05 (Fed. Cir. 1997) (emphasis

added); *see also Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1333 (Fed. Cir.

2015)("'The scope of that claim, however, must be limited to the ornamental aspects of the

design, and does not extend to 'the broader general design concept.'").

     Plaintiff is correct in arguing that detailed written constructions are not required and may

be counterproductive.  The case law acknowledges this, but nevertheless mandates that courts

differentiate between the functional and ornamental as part of the claim construction process.

> A design patent's claim is thus often better represented by illustrations than a
> written claim construction. *Egyptian Goddess, Inc. v. Swisa, Inc.,* 543 F.3d 665,
> 679 (Fed.Cir.2008) (en banc). Also, detailed verbal claim constructions increase
> "the risk of placing undue emphasis on particular features of the design and the
> risk that a finder of fact will focus on each individual described feature in the
> verbal description rather than on the design as a whole." *Id.* at 680.  Even so, a
> district court may use claim construction to help guide the fact finder through
> issues that bear on claim scope. *Id.* **We have often blessed claim constructions,**
> **for example, where the court helped the fact finder "distinguish[ ] between**
> **those features of the claimed design that are ornamental and those that are**
> **purely functional**." *Id.* (citing *OddzOn Prods., Inc. v. Just Toys, Inc.,* 122 F.3d
> 1396, 1405 (Fed.Cir.1997)). Of course, a design patent cannot claim a purely
> functional design—a design patent is invalid if its overall appearance is "dictated
> by" its function. *Id.* at 668. . . . **So a design may contain both functional and**
> **ornamental elements, even though the scope of a design patent claim "must**
> **be limited to the ornamental aspects of the design."** *Ethicon Endo–Surgery,*
> 796 F.3d at 1333. **"Where a design contains both functional and non-**
> **functional elements, the scope of the claim <u>must</u> be construed in order to**
> **identify the non-functional aspects of the design as shown in the patent."**
> *OddzOn Prods.,* 122 F.3d at 1405.

*Sport Dimension, Inc. v. Coleman Co.,* 820 F.3d 1316, 1320 (Fed. Cir. 2016)(emphasis added).

     In a more subtle effort to avoid the Court's examination of the functionality issue in the

context of claim construction (more subtle than Defendant's "waiver" argument), Plaintiff

interjects the standards for determining infringement of a design patent, rather than those for

claim construction.  Infringement requires comparison of the "overall" design to the accused

design, but only after the design has been construed so as to differentiate between the functional

and ornamental. Notwithstanding Plaintiff's arguments to the contrary (which rely on the law of

infringement rather than claim construction or validity), as the above-case law demonstrates, it is

not improper for the Court to engage in claim construction that identifies the functional – and

thus, non-protected portions – of the patented design.

## IV.     THE APPROPRIATE DEFINITIONS OF "ORNAMENTAL" AND "FUNCTIONAL"

In the context of determining the validity of a design patent or during the claim

construction process for a design patent, the terms "ornamental" and "functional" have defined

meanings. Because the validity analysis and claim construction seek determination of the same

issue – ornamentality v. functionality – the case law regarding one is generally applicable to the

other in the design patent context.  *Sport Dimension, Inc. v. Coleman Co.*, 820 F.3d 1316, 1322

(Fed. Cir. 2016)("Although we introduced these factors to assist courts in determining whether a

claimed design was dictated by function and thus invalid, they may serve as a useful guide for

claim construction functionality as well.").

The definitions of ornamental and functional in this context are intertwined, with a

finding of functionality generally precluding a finding of ornamentality (and vice versa).  The

definition of "ornamental" derives from the patent statute itself and the related patent rules,

procedures, and case law.  The statute provides: "Whoever invents any new, original and

ornamental design for an article of manufacture may obtain a patent therefor, subject to the

conditions and requirements of this title." 35 U.S.C. § 171.  The Manual for Patent Examination

Procedure ("MPEP"), in the section explaining the proper statutory subject matter for design

patents, based on binding case law, differentiates between functionality and ornamentality as

follows:[1]

I. FUNCTIONALITY VS. ORNAMENTALITY

An ornamental feature or design has been defined as one which was "created for
the purpose of ornamenting" and cannot be the result or "merely a by-product" of
functional or mechanical considerations. *See In re Carletti*, 328 F.2d 1020, 140
USPQ 653, 654 (CCPA 1964); *Blisscraft of Hollywood v. United Plastic Co.*, 189
F. Supp. 333, 337, 127 USPQ 452, 454 (S.D.N.Y. 1960), *aff'd*, 294 F.2d 694, 131
USPQ 55 (2d Cir. 1961). It is clear that the ornamentality of the article must be
the result of a conscious act by the inventor, as 35 U.S.C. 171 requires that a
patent for a design be given only to "whoever invents any new, original, and
ornamental design for an article of manufacture." Therefore, for a design to be
ornamental within the requirements of 35 U.S.C. 171, it must be "created for the
purpose of ornamenting." *See In re Carletti*, 328 F.2d 1020, 1022, 140 USPQ
653, 654 (CCPA 1964).

To be patentable, a design must be "primarily ornamental." "In determining
whether a design is primarily functional or primarily ornamental the claimed
design is viewed in its entirety, for the ultimate question is not the functional or
decorative aspect of each separate feature, but the overall appearance of the
article, in determining whether the claimed design is dictated by the utilitarian
purpose of the article." *See L. A. Gear Inc. v. Thom McAn Shoe Co.*, 988 F.2d
1117, 1123, 25 USPQ2d 1913, 1917 (Fed. Cir. 1993). The court in *Norco
Products, Inc. v. Mecca Development, Inc.*, 617 F.Supp. 1079, 1080, 227 USPQ
724, 725 (D. Conn. 1985), held that a "primarily functional invention is not
patentable" as a design.
. . .
While ornamentality must be based on the entire design, "[i]n determining
whether a design is primarily functional, the purposes of the particular elements
of the design necessarily must be considered." *See Power Controls Corp. v.
Hybrinetics, Inc.*, 806 F.2d 234, 240, 231 USPQ 774, 778 (Fed. Cir. 1986). *See,
e.g., Smith v. M & B Sales & Manufacturing*, 13 USPQ2d 2002, 2004 (N. D. Cal.
1990) (if "significant decisions about how to put it [the item] together and present
it in the marketplace were informed by primarily ornamental considerations", this
information may establish the ornamentality of a design.).

MPEP § 1504.01(c) - Lack of Ornamentality.

---

[1] "While the MPEP does not have the force of law, it is entitled to judicial notice as an official
interpretation of statutes or regulations as long as it is not in conflict therewith." *Molins PLC v.
Textron, Inc.*, 48 F.3d 1172, 1180, ft. 10 (Fed. Cir. 1995).

Case law more recent than that cited in the MPEP is consistent with the MPEP criteria.

For example, in a 2007 decision, the Federal Circuit provided this "Overview of Design Patent

Law:"

> "A design patent protects the nonfunctional aspects of an ornamental design as shown in the patent." *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed.Cir.1995) (*citing KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1450 (Fed.Cir.1993)). The chief limitation on the patentability of designs is that they must be primarily ornamental in character. If the design is dictated by performance of the article, then it is judged to be functional and ineligible for design patent protection. *Best Lock Corp. v. Ilco Unican Corp., 94 F.3d 1563, 1566* (Fed.Cir.1996).

*Arminak & Assocs., Inc. v. Saint-Gobain Calmar, Inc.*, 501 F.3d 1314, 1319 (Fed. Cir. 2007),

*abrogated on other grounds*, by *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir.

2008).

Again in 2010, after the Federal Circuit's 2008 *en banc* decision in *Egyptian Goddess*

(which established the currently controlling design patent infringement test), the Federal Circuit

reaffirmed the meanings of ornamental and functional in the context of design patents:

> The district court here properly factored out the functional aspects of Richardson's design as part of its claim construction. By definition, the patented design is for a multi-function tool that has several functional components, and we have made clear that a **design patent, unlike a utility patent, limits protection to the ornamental design of the article**. *Lee v. Dayton–Hudson Corp.,* 838 F.2d 1186, 1188 (Fed.Cir.1988) (citing 35 U.S.C. § 171). **If the patented design is primarily functional rather than ornamental, the patent is invalid**. *Id.*
> . . . A claim to a design containing numerous functional elements, such as here, necessarily mandates a narrow construction. Nothing in our *en banc Egyptian Goddess* opinion compels a different outcome.

*Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1293–94 (Fed. Cir. 2010)(emphasis added).

In determining whether a particular design or feature is ornamental or functional, the

Federal circuit has provided a list of relevant factors that should be considered (sometimes

referred to as the *PHG* factors):

10

> whether the protected design represents the best design; whether alternative
> designs would adversely affect the utility of the specified article; whether there
> are any concomitant utility patents; whether the advertising touts particular
> features of the design as having specific utility; and whether there are any
> elements in the design or an overall appearance clearly not dictated by function.

*PHG Techs., LLC v. St. John Companies, Inc.*, 469 F.3d 1361, 1366 (Fed. Cir. 2006).

With these appropriate definitions, tests, and factors established by the controlling case law, as demonstrated below, it is appropriate for the Court to issue a claim construction that identifies and distinguished between the functional and ornamental (if any) features of the designs of the Patent.

### V.   DEFENDANT IS ENTITLED TO A CLAIM CONSTRUCTION THAT IDENTIFIES THE FUNCTIONAL ASPECTS OF THE ASSERTED DESIGNS AND WHICH CONCLUDES THAT THE DESIGNS ARE <u>ENTIRELY FUNCTIONAL</u>

As demonstrated above, Defendant is entitled to a claim construction that differentiates between the functional aspects of Plaintiff's claimed designs and the ornamental features, if any. And as will be demonstrated below, applying the facts to the controlling case law dictates that the entirety of the patented design is functional.

Summarizing the law relating to functionality as it is most relevant to the facts here (all citations omitted): "An ornamental feature or design has been defined as one which was 'created for the purpose of ornamenting' and cannot be the result or 'merely a by-product' of functional or mechanical considerations.  It is clear that the ornamentality of the article must be the result of a conscious act by the inventor . . . .  Therefore, for a design to be ornamental within the requirements of 35 U.S.C. 171, it must be 'created for the purpose of ornamenting.' To be patentable, a design must be 'primarily ornamental.'  While ornamentality must be based on the entire design, '[i]n determining whether a design is primarily functional, the purposes of the particular elements of the design necessarily must be considered.'"  "If the design is dictated by

11

performance of the article, then it is judged to be functional and ineligible for design patent protection." In making these determinations, it is appropriate to consider the *PHG* and other relevant factors.

### A.      The Inventor of the Asserted Designs Publicly Stated He Designed the Chaise Lounge for Functionality

Here, on the issue of the functionality of the asserted designs, the founder, former chief executive, and primary named inventor of the asserted patents, Christopher Anderson, has spoken conclusively. In numerous public interviews, Anderson has explained how the design of the asserted chaise lounge was dictated by its function and that designing towards the function was his primary goal. In other words, the design of the asserted chaise was NOT "created for the purpose of ornamenting," but was "merely a by-product' of functional or mechanical considerations." As Anderson repeatedly explained, his design was "dictated by performance of the article." Therefore, "it is judged to be functional and ineligible for design patent protection."

By way of summary, Anderson explained that he designed the chaise to be used in a pool, placed on a tanning ledge inside the pool (rather than next to a pool), partially submerged in the pool water and partially exposed, so that predetermined portions of the user's body were submerged in the pool water and other predetermined portions were above the pool water. Anderson additionally designed the chaise to fit the average person, after conducting research on such statistics, admittedly sacrificing the comfort of those falling outside of the "average" body size and type.

The details of Anderson's public statements are set forth in Defendant's Answer, Defenses, and Counterclaims, at paragraphs 38-42, 54 (ECF # 33) and in Defendant's Preliminary Invalidity Contentions at paragraphs 1.e.i. – v. (Exhibit 1 hereto and incorporated

herein).  Page limitations of this brief preclude reciting all of Anderson's statements, but highlights include:

<u>December 2018 "Pool Chasers" podcast:</u>

50:20 – "You know for us in the beginning, we did some basic research on ergonomics, um, you know the average size individual. Because to you the chase might be extremely comfortable, but look I'm not afraid to say it live on a podcast that to some people it's not comfortable at all. **Well certainly we have to develop and design the chaise to fit the average individual, the average person out there.** So we had to say what's our range is it going to be the person that's 5' 8" to 6 foot, or is it going to be a person that's 5' 4" to 5' 8?"

"Well, there is information and stats and data and ergonomics. You can simply do an online survey or, excuse me, an online search and find that information. So we, you know, we took that into consideration we also you know meet some quicktype prototype type things and lay in them. **But what was more important was the way that you interact with the water making sure that it was gonna be low enough to the ground where you're actually when you're in the water you're not just....you're actually laying in the water you have water on your butt on your body. Some of those things were a little bit more important."**

"So you know we had to we had to accept the reality of this is gonna be a hard plastic that's in the pool, **so it was really important for it to have a contour that related to the average body style and type.** We also had to sacrifice, because we did have some people sit in our original prototypes and say hey this doesn't fit me well. Well, you know, I'm sorry that it doesn't fit you well but we have to we have to hit the average market here because there's mainly so many people outside of the average and the more and more you go outside the average the less the less people it's gonna be comfortable for. So you know, we did, we did do our ergonomics research."

<u>September 3, 2019 "Outside the Box Casual Living" podcast:</u>

2:20 – "**I set out to come up with something that you could utilize in the pool, you could partially be submerged,** <u>and at the same time it wouldn't damage the pool interior and it wouldn't damage the product.</u>";

8:37 – "**With our products, we did, on purpose, angle the back of the chaise a little bit lower than most and the reason being is because, if I want to lay back and forget about the world, I can take the headrest pillow off and it's very comfortable and I can lay back and forget about the world. If I want to see the activity that is going on in front of me, I can add the headrest pillow and now kinda bring my head forward a little bit where I can pay attention to what's going on.** Whereas in, a few of the recent competitors, have brought the

back quite a bit more forward and now kinda stuck in this spot of wanting to see what's in front of me and not really being able to lay back. And's that, if anything I would say that's the one negative thing about in-water furniture, is it's not adjustable, other than taking the headrest pillow on and off.";
April 24, 2020 "StellarZone" podcast:

**"I was inspired to develop a piece of furniture that you could put in the tanning ledge and you could lay out with partial of your body in the water, partial of your body out of the water and really enjoy that space. And that's pretty much how Ledge Lounger got founded."**

It is the existence of these statements (and others) and the fact that the inventor's intent in designing the chaise (did functionality or ornamentality dictate the design choices)[2] is a relevant consideration that caused Defendant to identify Anderson as a witness to be called at the *Markman* hearing.  While Defendant believes the statements are admissible in the context of a *Markman* hearing, they are out of court statements potentially subject to a motion to strike on hearsay grounds. Thus, having Anderson available to testify at the *Markman* hearing would eliminate this potential issue.  And contrary to Plaintiff's position, there is no prohibition on the testimony of inventors as part of the *Markman* process. *Voice Techs. Grp., Inc. v. VMC Sys., Inc.*, 164 F.3d 605, 615 (Fed. Cir. 1999)("This court in *Markman* did not hold that the inventor cannot explain the technology and what was invented and claimed; the Federal Circuit held only that the inventor cannot by later testimony change the invention and the claims from their meaning at the time the patent was drafted and granted.").

---

[2] *See infra*, MPEP § 1504.01(c)("An ornamental feature or design has been defined as one which was "created **for the purpose** of ornamenting" and cannot be the result or "merely a by-product" of functional or mechanical considerations. **It is clear that the ornamentality of the article must be the result of a conscious act by the inventor**, as 35 U.S.C. 171 requires that a patent for a design be given only to "whoever invents any new, original, and ornamental design for an article of manufacture." Therefore, for a design to be ornamental within the requirements of 35 U.S.C. 171, it must be "created for the purpose of ornamenting." (citations omitted).

With these statements by the inventor in mind, and in reviewing the patented designs, it is clear that the design of the chaise was dictated by its function.  It is admittedly an elegant design.  The elegance results from its simplicity, which in turn results from stripping away all of the ornamentation from the design of the chaise. The resulting chaise reflects the fundamental shape of a chaise, with nothing extraneous and nothing "ornamental."



**FIG. 4**

Other than the fundamental shape of the chaise, the specific silhouette of which is dictated by the function, no ornamentation exists.  But the fact that the patented design is elegant or pleasant to look at does not, on its own, mean that that the design is "ornamental."  Indeed, as the Court of Customs and Patent Appeals explained many years ago:

> The appearance of appellants' gasket seems as much dictated by functional considerations as is the appearance of a piece of rope, which, too, has ribs and grooves nicely arranged. The fact that it is attractive or pleasant to behold is not enough. Many well-constructed articles of manufacture whose configurations are dictated solely by function are pleasing to look upon, for example a hex-nut, a ball bearing, a golf club, or a fishing rod, the pleasure depending largely on one's interests. But it has long been settled that when a configuration is the result of functional considerations only, the resulting design is not patentable as an ornamental design for the simple reason that it is not 'ornamental'— was not created for the purpose of ornamenting.

*Application of Carletti*, 328 F.2d 1020, 1022 (C.C.P.A. 1964).

**B.    Plaintiff Owns Utility Patents that Dislcose the Functionality
of the Asserted Design**

Under the *PHG* factors, the existence of "concomitant utility patents" is also relevant to

the functionality of a design patent.  Here, Plaintiff owns numerous relevant utility patents

(which are not asserted in this action) that disclose a nearly identical design and which explain

the utility of such design.  More specifically, Plaintiff owns U.S. Patent Nos. 10,104,975 and

10,676,245 (which is related to the '975 Patent, such that they have similar specifications), both

of which were filed prior to the filing of the patents-in-suit. Though the claims were ultimately

limited, the utility patents nonetheless disclose the utility of design of the asserted design patents.

Again, as with the inventor's statements, space prevents a recitation of all of the relevant

portions of the utility patents, but highlights of the '975 Patent include:

Figures 2, 3, 4A, and 8 and the portions of the specification relating to thereto;

Col. 1, ln. 62-63; "Said submergible furniture is configured to be partially submerged in a
external body of liquid.";

Col. 2, ln. 25-34; "A submergible furniture is disclosed. . . . an outer shell and an internal cavity
is configured to be partially submerged in a external body of liquid having a external liquid level.
. . . Said submergible furniture is configured to be partially submerged in a external body of
liquid.";

Col 4, ln. 52-57; "Designs for said chair 100b are well - known in the art and may comprise
variations on the shape and dimensions of said chair 100b . **Here ,said chair 100b has a wave
shape having said back 202 with a higher height than said lower bend 206," and "said
lower bend 206 has a gentle arc as coming up from said seat 204 and down to said foot rest
208.";**

Col., 5, ln. 27-29; "**said chair 100b has a first lower portion 402a and a second lower portion
402b where water may be captured having different water levels.";**

Col. 6, ln. 60-67 and Col. 7, ln. 1-10; ". . . in one embodiment, said chair 100 b can comprise an
outer shell 808, and a portion of said body of water 800 can be held inside of said outer shell 808
at an internal water level 802. In one embodiment, said body of water 800 can comprise an
external water level 804. In one embodiment, said external water level 804 can be lower than
said internal water level 802. Accordingly, said submergible furniture 100 are likely to remain
partially submerged since a portion of said body of water 800 is held above said external water

level 804 and therefore holds said chair 100 b below said external water level 804. Likewise, ensuring no air is within said outer shell 808 and below said water level 804 will help said chair 100b from floating within said body of water 800 and therefore will by-and-large remain planted on a ground surface 806."

Figure 8 (the description of which appears immediately above):



FIG. 8

As the specifications of the utility patents explained, the shape of the chaise is specifically configured so that when sitting it in the chair, the user and the chair will be partially submerged.  Moreover, the specific shape of the chaise is designed so that when internal cavity is partially filled with water (the level of which is dictated by the specific curve), the chair will be held in place ("help said chair 100b from floating within said body of water").  The description of the functionality as contained in the utility patents is consistent with the functionality of the design as described by the inventor.

17

Moreover, advertisements for the product tout similar functional features.[3]  As the advertisements for the chaise explain, it was "designed for lounging in up to 8 inches of water" and "contoured for comfortable support."  Indeed, based on the specific chosen contours, the lounger can only perform its intended function, in up to 8 inches of water.  If the chair is placed in deeper water, the intended portions of the chaise, and thus, the intended portion of the user's body will not be in (or out of) the water as intended.

Thus, the overall shape of the design of the Patents is dictated by its function.  The specific angles and curves were chosen specifically to fit the 'average' person and ensure that specific preselected portions of the chaise and its user were submerged, while other portions remained above water.  The thickness of the chair reflects the fact that the designer wanted a hollow space (between the surface the user sits on the and bottom of the chaise) that could be partially filled with water to ensure that the chaise remained submerged and stationary when in use.  The specific material of the chair, which dictates its smooth surface, was chosen because the chaise would be placed in the water.  The chair is "fixed," rather than adjustable, so that there are no parts to rust or decay in the water.  After all of the functionality was designed into the chair, nothing else – by way of surface ornamentation or extraneous design flourishes – was included.  The design of the Patents is the perfect example of "form follows function."

In the event the Court is disinclined to distinguish between the functional and ornamental (if any) feature of the Patents as part of the claim construction process, Defendant is nonetheless entitled to a claim construction for the term "ornamental."  The fundamental purpose of the claim

---

[3] Despite revealing the information to Defendant without protection or limitation, Plaintiff currently claims that the identity of the customer selling the chaise allegedly protected by the Patents is "confidential."  Thus, until the issue is resolved, Defendantant will refrain from publishing the identity of the customer or the specific source the advertisements.

construction process is to determine the meaning of the claim, so as to aid the jury (or fact finder) in making its invalidity and non-infringement determinations. *E.g., Funai Elec. Co. v. Daewoo Elecs. Corp.,* 616 F.3d 1357, 1366 (Fed. Cir. 2010).  Because a design patent only protects the ornamental features of the design, and because "ornamental" in this context does not have its ordinary, dictionary definition, a claim construction for the term "ornamental" would aid the jury and thus, Defendant is entitled to such a construction.  Defendant has suggested a claim construction that is consistent with the definition found in the MPEP (which in turn summarizes the controlling case law, namely: "ornamental design" means the portion of the claimed design, if any, that was created for the purpose of ornamenting, was not the by-product of functional or mechanical considerations, and was created for the specific purpose of ornamenting.

## VI.   <u>CONCLUSION</u>

As Defendant demonstrated above, the inventor of the design shown in the Patents created the design for functional reasons.  He confirmed this fact in his numerous public statements.  The content of the related utility patents and advertisements confirm this.  Accordingly, Defendant is entitled to a claim construction that confirms that the Patents are entirely functional.

Respectfully submitted,

Dated: Katy, Texas
December 29, 2023

**NOLTE LACKENBACH SIEGEL**

/s/ Robert B. Golden
Robert B. Golden
Admitted pro hac vice
Wade Johnson
2717 Commercial Center Blvd., Ste E200
Katy, Texas 774941
Tel.: 866.201.2030
Email: rgolden@nls.law
         wjohnson@nls.law
Attorneys for Defendant Luxury Lounger, Inc.